**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

MELANIE OCHS,

                                        Petitioner,

v.

DWIGHT NEVEN,[1] et al.,

                                        Respondents.

Case No.: 2:16-cv-00982-JCM-DJA

**ORDER**

Melanie Ochs, a Nevada prisoner, filed a petition for writ of habeas corpus (ECF No. 18) under 28 U.S.C. § 2254. This court denies Ochs' habeas petition, grants her a certificate of appealability for ground 5 only, and directs the clerk of the court to enter judgment accordingly.

**I.    BACKGROUND[2]**

Ochs' conviction is the result of events that occurred in Clark County, Nevada on or about August 2, 2006. (ECF No. 34-2.) Paramedics responded to Ochs' home that day in the early

---

[1] The state corrections department's inmate locator page states that Ochs is currently incarcerated at Florence McClure Women's Correctional Center. *See* https://ofdsearch.doc.nv.gov/ (retrieved September 2021). The department's website reflects Jerry Howell is warden for that facility. *See* https://doc.nv.gov/Facilities/FMWCC_Facility/ (retrieved September 2021). At the end of this order, the court directs the clerk to substitute Ochs' current physical custodian, Jerry Howell, as a respondent for the prior respondent Dwight Neven, pursuant to, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

[2] This court summarizes trial evidence and related state court record material and proceedings as a backdrop to its consideration of the issues presented in the case. The court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the court overlooked it in considering Ochs' claims.

afternoon and found Ochs giving her seven-month-old foster child, B.B.C., CPR. (ECF No. 35-36 at 31-34.) An EMT explained that the back, left side of B.B.C.'s head felt like mush, and he was "unresponsive [and] pulseless." (ECF Nos. 35-36 at 34; 35-37 at 1.)

Ochs told the EMT that she did not know what happened to B.B.C. but that "she found the baby in the crib motionless" and that he may have fallen "while playing with siblings prior to [being put] in the crib." (ECF No. 35-37 at 2.) Ochs also told the EMT that B.B.C. "vomited and [she was] going to wash [her] hands, [she] love[s] him but this is disgusting." (*Id.*) And when another paramedic asked Ochs what happened to B.B.C., Ochs was "[v]ery unhelpful" and "said she had two other kids and left the room."[3] (*Id.* at 19.)

B.B.C. was transported to Summerlin Hospital, but he was later transferred to University Medical Center (hereinafter "UMC"). (ECF No. 35-38 at 68.) A CAT scan showed that B.B.C. was suffering from a skull fracture on the right side of his head and swelling of the left side of his head. (*Id.* at 120.) B.B.C. died two days later, on August 4, 2006, after it was determined that he was brain dead and was removed from life support. (ECF No. 35-39 at 2, 20.) B.B.C.'s cause of death was determined to be blunt force trauma to the head, and the manner of death was determined to be homicide. (*Id.* at 70, 72.)

When speaking with hospital staff, Ochs first stated that B.B.C. "had fallen in the tub and hit his head," but she later reported that "her two-year-old had bumped the baby, who was sitting on the ground, and knocked the baby over." (ECF No. 36-1 at 42-43.) However, during her interview at the hospital and reenactment at her residence with police investigators and CPS, which both occurred on August 2, 2006, Ochs never mentioned that B.B.C. had fallen. (*See* ECF No. 35-40 at 25-27, 41.)

---

[3] Ochs had a biological daughter and an adopted son. (ECF No. 35-38 at 17.)

Jean Marie Schirling, who recommended Ochs to be a foster mom, testified that a few days prior to August 2, 2006, Ochs told her that "she was going to ask for [B.B.C.'s] removal" because she felt overwhelmed and that she had not bonded with B.B.C. (ECF No. 36-1 at 68-69, 80-81.) Ochs denied that B.B.C. had fallen when she had a conversation with Schirling at Summerlin Hospital the day of the incident. (*Id.* at 87-91.) And on August 4, 2006, Ochs told Schirling that B.B.C. "was dead that she killed the baby, and that her kids were going to be taken away." (ECF No. 36-2 at 4.)

Ochs testified that on August 2, 2006, she and the children—her daughter, her son, and B.B.C.—woke up "around 8:00 or 8:30" in the morning, ate breakfast, played in the backyard, went to story time at a local bookstore, got lunch at McDonald's, and then ate their lunch in their vehicle in the driveway of their residence. (ECF No. 36-4 at 54.) While they were in the vehicle, B.B.C. pooped, so Ochs took all three children inside and started to change B.B.C.'s diaper on top of the washing machine—her usual location for changing his diaper. (*Id.* at 55.) As Ochs "was starting to change his diaper," the two other children needed help in the bathroom, so Ochs "went across the hallway to the bathroom" and left B.B.C. on the washing machine. (*Id.*) Ochs testified that B.B.C. "couldn't roll from his back to his stomach," so she "thought if [she] place[d] him at the back of the washing machine, he[ would] be safe." (*Id.*) While Ochs was in the bathroom across the hall, she "heard a thump and a [cry] and [she] went back across the hall and he had fallen off the washing machine." (*Id.*) Ochs speculated that B.B.C. "craned his head backwards, which rotated him enough to get his feet up by the controls" of the washing machine, and then he managed to "push himself off the side of the washing machine." (ECF No. 36-5 at 38.)

Ochs explained that B.B.C. "was moving around and he seemed okay. And [she] picked him up and the back of his head was a little bit pink, but it didn't . . . look like anything." (ECF

No. 36-4 at 55-56.) Ochs then read the three children some stories on the couch, and B.B.C. fell asleep. (*Id.* at 56.) Ochs "took him upstairs and put him in his bed," and then she got the other two children situated for nap time before going back to check on B.B.C. (*Id.*) When she returned to B.B.C.'s room, "he didn't look right," and when she picked him up, he was limp. (*Id.*) Ochs blew in his mouth, and B.B.C. "vomited all over [her] and [she] took him in the bathroom and cleaned out his mouth." (*Id.* at 57.) Ochs then called 911, and as she was giving B.B.C. CPR as instructed by 911, she "put [her] hand on his head, [and] it was squishy under [her] fingers." (*Id.*) Ochs "thought, oh, my God, he hurt himself worse than [she] had ever even imagined." (*Id.*)

Ochs did not tell medical personnel about B.B.C.'s fall from the washing machine because she thought "they'll just come and take him straight away," and instead, because she wanted them "to know that he hurt his head" in order to treat him, she told them about other falls, including that "he had been pushed over because [her] daughter did occasionally tip him over when he was sitting up." (ECF No. 36-4 at 57.) Regarding her meeting with CPS and other investigators, Ochs testified that she "was trying to answer every question that they put to [her] to give them as much information as [she] possibly could without admitting that [she] had let him fall off of the washing machine." (*Id.* at 70.) Ochs denied that she ever "indicated to anyone that [she] wanted [B.B.C.] to" be removed from her care. (*Id.* at 42.)

Following a jury trial, Ochs was found guilty of first-degree murder and sentenced to 20 to 50 years in prison. (ECF No. 21-1 at 2-3.) Ochs appealed, and the Nevada Supreme Court affirmed on October 27, 2011. (ECF No. 21-5.) Remittitur issued on November 21, 2011. (ECF No. 36-45.)

Ochs' *pro se* state habeas petition and counseled supplemental petition were filed on March 9, 2012, and July 19, 2013, respectively. (ECF Nos. 21-6, 21-7.) The state district court denied the petition on December 30, 2013. (ECF No. 21-8.) Ochs appealed, and the Nevada Supreme Court

affirmed on July 22, 2014. (ECF No. 21-11.) Remittitur issued on August 19, 2014. (ECF No. 37-24.)

Ochs' *pro se* federal habeas petition and counseled amended petition were filed on July 14, 2016, and September 12, 2017, respectively. (ECF Nos. 4, 18.) The respondents moved to dismiss the amended petition on February 2, 2018. (ECF No. 20.) This court denied the motion. (ECF No. 26.) The respondents answered Ochs' petition on October 21, 2019, and Ochs replied on June 2, 2020. (ECF Nos. 51, 56.)

Ochs alleges the following violations of her federal constitutional rights:

1.      The state district court improperly admitted expert testimony.
2.      The state district court improperly limited defense expert testimony.
3.      The state district court improperly permitted the state's experts to opine on her guilt.
4.      The state district court improperly admitted character evidence.
5.      The state district court used erroneous jury instructions.
6.1     Her trial counsel failed to object at several points.
6.2     Her trial counsel failed to comply with discovery rules.
6.3     Her trial counsel opened the door to the admission of bad act testimony.
6.4     Her trial counsel's failures, considered cumulatively, prejudiced her.

(ECF No. 18.)

## II.     STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

6

## III.   DISCUSSION

### A.   Ground 1

In ground 1, Ochs alleges that the state district court admitted unqualified expert testimony. (ECF No. 18 at 18.) Ochs elaborates that the state's four experts presented improper anecdotal opinion evidence that a single fall could not account for B.B.C.'s injuries with no logical or scientific foundation. (*Id.* at 21.) In its order affirming Ochs' judgment of conviction, the Nevada Supreme Court held:

> Ochs argues that the district court erroneously permitted testimony from the State's experts regarding force and biomechanical principles in relation to the baby's injuries because that testimony was unqualified and highly prejudicial. Ochs contends that the State's witnesses gave unqualified testimony that failed to assist the trier of fact as required under NRS 50.275, because they lacked training or expertise as biomedical engineers. We disagree.
>
> This court reviews a district court's decision to admit or exclude evidence and its decision whether a witness is qualified to be an expert for an abuse of discretion. *Thomas v. State*, 122 Nev. 1361, 1370, 148 P.3d 727, 734 (2006); *Mulder v. State*, 116 Nev. 1, 12-13, 992 P.2d 845, 852 (2000). The threshold test for admissibility of testimony by a qualified expert is whether the expert's specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. NRS 50.275; *Townsend v. State*, 103 Nev. 113, 117, 734 P.2d 705, 708 (1987). Once this requirement is met, a qualified witness may testify to any matters within the scope of his or her expertise. NRS 50.275.
>
> Ochs's argument presupposes that the State's sole purpose for presenting the expert testimony was to discredit the biomechanical principles underlying her theory of causation. [Footnote 1: A review of the record belies Ochs's suggestion that the State's experts were unqualified. The experts testified based on their first-hand knowledge resulting from treating the baby, inspecting the baby or his records, and their knowledge of available research and data.] However, the State's case was not about biomechanics. The State's experts testified specifically about the baby's injuries based on their knowledge from treating him or inspecting his body or CT scans. While one of the State's experts did testify specifically about biomechanics, his testimony was based on the same studies and research on which Ochs's own experts relied. Through their testimony, the State's experts assisted the jury in understanding the nature of the baby's injuries and the possible causes, which were material facts in issue. Therefore, we conclude that the district court did not abuse its discretion in allowing the State's expert testimony.

(ECF No. 21-5 at 3-4.) The Nevada Supreme Court's rejection of Ochs' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.[4]

The state presented the testimony of four experts: Dr. Arthur Montes, Dr. Meena Vohra, Dr. Gary Telgenhoff, and Dr. John Gowan. First, Dr. Montes, a pediatric radiologist, testified that he reviewed "two CAT scans of [B.B.C.'s] brain and several other regular, plain radiographs of [B.B.C.'s] skeleton" at the request of law enforcement. (ECF No. 35-37 at 6-7.) From his review of those medical records, Dr. Montes determined that B.B.C. had "a fracture [o]n the right side of [his] skull" and "a big hematoma or area of swelling [o]n the other side of [his] head, toward the back." (*Id.* at 8.) Dr. Montes testified that B.B.C.'s injuries could not have been caused by a short fall: "I believe [that] the fracture could have happened from a short fall or the swelling. But I need two short falls to explain both sides being involved." (*Id.* at 12.) Dr. Montes elaborated:

> if we have one fall, the energy it takes to cause the fracture would be absorbed and cause the fracture. And so I don't have enough explanation for if you say he hit something on the way toward the floor to cause the other side, then that would have probably decreased the energy enough so that he didn't get the fracture on the other side. But it was never said that he hit anything on the way toward the floor. And a child this age doesn't really have much control where he's going to try to stop himself from falling. He's basically just going to fall and hit the ground and that's - - that will be it. So I don't have another - - I can't explain what else he could have done or could have happened to him in one fall to cause something on the other side of the head like this.

---

[4] Ochs argues that this court should review this claim *de novo* because the Nevada Supreme Court misconstrued her claim as a complaint that the state district court erroneously exercised its discretion regarding the state's experts' qualifications, but her claim also included the argument that the state's experts' opinions were improperly based on anecdotal evidence. (ECF No. 56 at 21-22.) This court disagrees. The Nevada Supreme Court's statement that the state's experts' testimony assisted the jury in understanding the possible causes of B.B.C.'s injuries, which was based on the experts' alleged anecdotal opinions, demonstrates that it considered the issue of anecdotal evidence. However, even reviewing this ground *de novo*, this court concludes that Ochs is not entitled to federal habeas relief.

(*Id.*) Dr. Montes also did not believe that B.B.C.'s injuries occurred by contrecoup, meaning "when the brain hits one side, it bounces back and hits the other side of the skull and causes another injury," because "the amount of injury on the other side [of B.B.C.'s head] was so massive." (*Id.* at 14-15.) During cross-examination, Dr. Montes testified that he had not read an article about short falls but that he "went to a lecture recently." (*Id.* at 14.)

Second, Dr. Vohra, a pediatric intensivist and the director of the Pediatric Intensive Care Unit at UMC, testified that she treated B.B.C. at UMC. (ECF No. 35-38 at 111-12, 114.) Dr. Vohra examined B.B.C when he arrived at UMC, explaining that he was on life support, was intubated, was not "responding to any stimulus or any noxious stimulus," and had "a swelling on the left side of his head" and bruising "over his right eyebrow" and on his lower quadrants "where the abdomen joins the legs." (*Id.* at 118.) B.B.C. had received a CAT scan from Summerlin Hospital which showed that he "a skull fracture on the right side [of his head and] swelling of the left side." (*Id.* at 120.) Another CAT scan was taken at UMC which showed that his "swelling was getting worse and more injury was occurring." (ECF No. 35-39 at 3.) According to Dr. Vohra, "[t]he way [B.B.C.] presented didn't seem consistent with just falling off a [washing] machine and getting a skull fracture" because that would not "explain why the fracture was on one side and the swelling was on the other." (ECF No. 35-39 at 9.) Rather, it appeared to Dr. Vohra that B.B.C. had sustained two injuries. (*Id.*) Dr. Vohra explained further: "I could explain some of the injuries from falling off the washing machine like the skull fracture. But I cannot explain the swelling, the significant scalp swelling and the significant brain swelling that occurred." (*Id.* at 10.) Dr. Vohra testified that none of her patients had died from "fall[ing] from a distance . . . [of] three to five feet" and, in fact, she had never "seen the kind of injury that [she] saw in [B.B.C.] caused by a short fall in any of

the other children that [she had] treated." (*Id.* at 11-12, 26.) During cross-examination, Dr. Vohra testified that she had not recently read any articles on short falls. (*Id.* at 17-18.)

Third, Dr. Telgenhoff, a forensic pathologist who worked in the Clark County Coroner's office, testified that he performed an autopsy on B.B.C. on August 5, 2006. (ECF No. 35-39 at 43-44, 49.) Dr. Telgenhoff testified that "the impact point was obviously on the left" of B.B.C.'s head, but he had a "skull fracture on the right," which "suggest[ed] that there may have been two separate impacts to" B.B.C.[5] (*Id.* at 64.) Dr. Telgenhoff did not believe that B.B.C.'s injuries "could have occurred from a child falling off of a washing machine" due to "the discrepancy between the bruising on the left side of the head and the fracture on the right" because "[a] single strike on a floor isn't going to do that." (*Id.* at 73-74.) Dr. Telgenhoff also testified that a short fall resulting in a skull fracture and death is unlikely. (*Id.* at 111.) During cross-examination, Dr. Telgenhoff testified that he would not consider himself an expert in the field of biomechanics but that he had listened to "some biomechanical lectures" and read "a number of articles" on the subject. (*Id.* at 97.)

Fourth, Dr. Gowan, who practiced in pediatric emergency medicine, testified that he treated B.B.C. at Summerlin Hospital on August 2, 2006. (ECF No. 36-1 at 3, 10.) B.B.C. was not breathing on his own and was non-responsive when he arrived at Summerlin Hospital. (*Id.* at 12-13.) A CAT scan was taken of B.B.C., which showed "a lot of soft tissue swelling" and a skull fracture. (*Id.* at 16.) Based on B.B.C.'s CAT scan that "confirmed that there was some sort of brain problem," B.B.C. was transferred to UMC because Summerlin Hospital did not "have the capabilities . . . to care for an injured baby like that." (*Id.* at 18-19.) Dr. Gowan testified that he

---

[5] The state called Dr. Telgenhoff as a rebuttal witness again later in the trial, and he again testified that there were two impacts to B.B.C.'s head. (ECF No. 36-9 at 20.)

1   "couldn't really correlate the soft tissue swelling on one side with fractures on the opposing side

2   of the skull from a simple fall." (*Id.* at 22.) Dr. Gowan then elaborated:

> I've only seen one case where a fall was of a shorter height that resulted in an
> intracranial within the skull type of bleed. And that was a very peculiar case because
> the fracture went across an artery that caused a type of bleeding called an epidural
> bleed. And I see between 4,000 and 5,000 kids a year and have every year. So for
> almost 20 years. And in my experience less than 4 feet, 5 feet, I could see a skull
> fracture. But except for that one case I've not seen an intracranial injury like this.

7   (*Id.*) During cross-examination, Dr. Gowan testified that he read a textbook on short falls in 2008,

8   but he had not read a scholarly article since the early 1990s on short falls causing head injuries.

9   (*Id.* at 27.)[6]

10       A "habeas petitioner[ ] can allege a constitutional violation from the introduction of flawed

11   expert testimony at trial if they show that the introduction of this evidence undermined the

12   fundamental fairness of the entire trial." *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016)

13   (internal quotation marks omitted) (explaining that "courts have long considered arguments that

14   the introduction of faulty evidence violates a petitioner's due process right to a fundamentally fair

15   trial—even if that evidence does not specifically qualify as 'false testimony'"); *see also Estelle v.*

16   *McGuire*, 502 U.S. 62, 68-70 (1991); *Dowling v. United States*, 493 U.S. 342, 352-53 (1990).

17       Here, Dr. Montes, Dr. Vohra, Dr. Telgenhoff, and Dr. Gowan all testified that they believed

18   a single fall would not have caused B.B.C.'s injuries. (*See* ECF No. 35-37 at 12; ECF No. 35-39

19   at 9, 64; ECF No. 36-1 at 22.) Although these conclusions were not based upon scientific testing

20   or from research articles, as Ochs notes was the case with her own experts, Ochs fails to

21

---

22   [6] The state also called a rebuttal witness, Dr. Nagarajan Rangarajan, who had a degree in
23   biomedical engineering and engineering mechanics, to testify that he did not think that "the
research was really there to rely on biomechanics" to say factually "whether or not certain injuries
occurred in children." (ECF No. 36-7 at 60-61.)

demonstrate that the conclusions of the state's experts were based on faulty testimony. Rather, as the Nevada Supreme Court reasonably determined, they were based on the doctors' objective observations of B.B.C.'s injuries and their medical knowledge obtained from their trainings and their treatments of similar patients with similar injuries. As such, Ochs fails to demonstrate that the state's experts' conclusions that B.B.C.'s injuries were not the result of a single fall were unreliable, were based merely on personal beliefs, or were grounded in discredited or faulty science. Accordingly, Ochs fails to demonstrate that the state's experts' testimonies rendered her trial unfair in violation of due process. *Gimenez*, 821 F.3d at 1145. Therefore, because the Nevada Supreme Court reasonably denied this claim, Ochs is denied federal habeas relief for ground 1.

### B.      Ground 2

In ground 2, Ochs alleges that the state district court improperly limited defense expert testimony. (ECF No. 18 at 25.) Ochs elaborates that the state district court disallowed one of her experts, Dr. Mark Shuman, from giving testimony regarding current medical literature on child head injuries to show that current research indicated that B.B.C.'s injuries could have been caused by a single fall from the washing machine. (*Id.*) In its order affirming Ochs' judgment of conviction, the Nevada Supreme Court held:

> Additionally, Ochs argues that the district court erroneously excluded expert testimony regarding current medical research on biomechanical principles. In reviewing this contention, we must examine the language of NRS 174.295(2), which states:
>
>> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with the provisions of NRS 174.234 to 174.295, inclusive, the court may order the party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, <u>or prohibit the party from introducing in evidence the material not disclosed</u>, or it may enter such other order as it deems just under the circumstances.

(Emphasis added.) The State specifically requested the production of any articles Ochs intended to use at trial pursuant to NRS 174.245(1)(c), which requires the disclosure of "[b]ooks, papers, documents or tangible objects that the defendant intends to introduce in evidence during the case in chief of the defendant . . . within the possession, custody or control of the defendant . . . ." Ochs neither objected to nor complied with that request. [Footnote 2: Ochs also challenges the district court's interpretation of NRS 174.245 to include turning over documents when an expert proposes to testify as to their contents. She cites to *Born v. Eisenman* in support of her assertion that the statute does not require each piece of research that an expert relies on to be put into evidence. 114 Nev. 854, 861, 962 P.2d 1227, 1231 (1998). However, *Born* does not deal with the issue of introducing evidence that was not previously disclosed. *Id.* Here, during direct examination, Ochs's expert proposed to testify regarding the contents of articles that were not previously disclosed to the State. The trial court found that Ochs was in effect attempting to introduce those articles into evidence. We conclude that the district court did not abuse its discretion in excluding the testimony regarding these previously undisclosed articles.] Moreover, Ochs did not designate her expert, Dr. Shuman, as a biomechanics expert, nor did she provide adequate notice that he was going to testify as to the principles of biomechanics. Therefore, we conclude that the district court did not abuse its discretion in excluding Dr. Shuman's expert testimony.

(ECF No. 4-5.) The Nevada Supreme Court's rejection of Ochs' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.[7]

Dr. Shuman, a forensic pathologist, testified as a defense expert at Ochs' trial that he reviewed the medical evidence in the case and determined that B.B.C.'s cause of death was a blunt head injury and that the manner of death was undetermined. (ECF No. 36-2 at 13-14.) As Dr. Shuman started to explain what records he had reviewed in making those determinations, the state

---

[7] Ochs again argues that this court should review this claim *de novo* because the Nevada Supreme Court failed to address this claim, instead only addressing whether the state court properly exercised its discretion in light of state evidentiary rules. (ECF No. 56 at 25.) This court presumes that the Nevada Supreme Court adjudicated this claim on the merits. *See Harrington*, 562 U.S. at 99-100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). However, even reviewing this ground *de novo*, this court concludes that Ochs is not entitled to federal habeas relief.

interrupted, asking whether Dr. Shuman was reading from something. (*Id.* at 19-20.) After Dr. Shuman indicated that he was reading from his notes, the state district court took a break so that the state could review those notes. (*Id.* at 20.) During that break, Dr. Shuman asked if he could set up his computer "in case [he] g[o]t asked some questions about some research articles." (*Id.* at 21.) The state then explained that "by the discovery statutes, [it was] entitled to notes, and whatever this doctor relies upon." (*Id.* at 22.) However, because Ochs' trial counsel did not provide anything to the state, specifically any research articles, the state requested that Dr. Shuman be precluded from testifying. (*Id.*) The state district court agreed, in part, "preclud[ing] Dr. Shuman from referencing any of the articles" because it "interpret[ed Nev. Rev. Stat. §] 174.245, (1)(c) to include turning over documents when a doctor or expert is going to reference the articles." (ECF No. 36-3 at 20.) Dr. Shuman then testified that B.B.C.'s "entire injury can be explained by one impact in the back of the head, with fracturing elsewhere," and that a "short fall from the washing machine does explain [B.B.C.'s] injuries." (*Id.* at 30, 61-62.)

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) (explaining that an accused "has the right to present his own witnesses to establish a defense" and that "[t]his right is a fundamental element of due process of law"); *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) ("The Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense."). "[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A defendant's

opportunity to be heard "would be an empty one if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence." *Id.* This is because, "[i]n the absence of any valid state justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)). That being said, the United States Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Id.* at 690.

To be sure, allowing Dr. Shuman to discuss the research articles on his computer would have likely been beneficial defense evidence.[8] (*See* ECF Nos. 57-3, 57-4.) However, it cannot be concluded that Ochs' constitutional rights were violated by the state district court's limiting of Dr. Shuman's testimony.[9] The state district court determined that Nevada law—specifically Nev. Rev. Stat. § 174.245(1)(c)—allowed the preclusion of any discussion of the research articles by Dr. Shuman because Ochs' trial counsel did not disclose them to the state prior to trial. And the Nevada Supreme Court, the final arbiter of Nevada law, agreed. Accordingly, the state district court's determination that the evidence would be precluded by Nev. Rev. Stat. § 174.245(1)(c) constituted a valid state justification for the exclusion. *See Crane*, 476 U.S. 690-91. Based on this justification

---

[8] Indeed, Dr. Shuman was going to discuss what the articles "said and how he believed them, how he reviewed them, how he reviewed the methodology and how then he used that to conclude that it was an appropriate opinion for him to render." (ECF No. 36-3 at 18.)

[9] Ochs argues that "the last minute exclusion of a big part of Dr. Shuman's anticipated testimony was devasting." (ECF No. 56 at 27.) However, it appears that Ochs' trial counsel was unaware that Dr. Shuman was even planning on discussing the research articles. (*See* ECF No. 36-2 at 39 (statement by Ochs' trial counsel that he "didn't know [Dr. Shuman] was going to do the article thing until this morning, so" he had "been scrambling").)

1  for the exclusion and the fact that Dr. Shuman was not restricted from testifying about his ultimate

2  conclusion that B.B.C.'s injuries were consistent with a single fall from a washing machine, it

3  cannot be concluded that Ochs' right to present a complete defense, right to due process, and right

4  to a fair trial were violated. *Chambers*, 410 U.S. at 294; *Trombetta*, 467 U.S. at 485. Thus, because

5  the Nevada Supreme Court reasonably denied Ochs' claim, Ochs is denied federal habeas relief

6  for ground 2.

7  **C.      Ground 3**

8      In ground 3, Ochs alleges that the state district court improperly permitted the state's

9  experts to opine on her guilt. (ECF No. 18 at 27.) Ochs elaborates that by allowing the state's

10  experts to testify that B.B.C.'s injuries could not have been the result of an accidental fall from a

11  washing machine, the state district court effectively permitted the state's experts to opine on her

12  guilt and veracity. (*Id.*) In its order affirming Ochs' judgment of conviction, the Nevada Supreme

13  Court refused to review this argument on appeal because she "failed to object below." (ECF No.

14  21-5 at 5.) As such, this court reviews this claim *de novo*. *See Cone v. Bell*, 556 U.S. 449, 472

15  (2009); *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

16      Ochs only cites two Nevada cases for her argument that the state's experts' testimonies

17  were impermissible: *Lickey v. State*, 108 Nev. 191, 196, 827 P.2d 824, 827 (1992), which provided

18  that "[a]n expert may not comment on the veracity of a witness," and *In re Assad*, 124 Nev. 391,

19  400, 185 P.3d 1044, 1050 (2008), which provided that if expert testimony "is irrelevant or if it

20  impermissibly encroaches on the trier of fact's province, then it is properly excluded." (ECF No.

21  56 at 28.) However, "[a] mere error of state law . . . is not a denial of due process." *Rivera v.*

22  *Illinois*, 556 U.S. 148, 158 (2009); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal

23  habeas relief does not lie for errors of state law."); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

Moreover, the state's experts did not directly opine on Ochs' guilt or veracity; rather, the experts merely opined that B.B.C.'s injuries were not consistent with Ochs' version of events—that B.B.C. suffered a single fall from a washing machine. Ochs is denied federal habeas relief for ground 3.

### D.      Ground 4

In ground 4, Ochs alleges that the state district court admitted improper character evidence. (ECF No. 18 at 27.) In its order affirming Ochs' judgment of conviction, the Nevada Supreme Court held:

> Although she did not raise an objection below, Ochs now argues that the district court improperly allowed the admission of evidence of her prior bad acts during the State's questioning of her neighbor, a defense witness. Specifically, she contends that the State had no basis for questioning her neighbor and that the admission of these prior bad acts was prejudicial. We disagree.
>
> A failure to objection during trial generally precludes appellate review. *Rippo v. State*, 113 Nev. 1239, 1259, 946 P.2d 1017, 1030 (1997). However, we have the discretion to review an unpreserved error where the error is plain and it affected a defendant's substantial rights. *Gallego v. State*, 117 Nev. 348, 365, 23 P.3d 227, 239 (2001); *see* NRS 178.602. Plain error is error "so unmistakable that it reveals itself by a casual inspection of the record." *Patterson v. State*, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995) (internal quotations and citations omitted).
>
> The record reveals that the State only presented the evidence in question for impeachment purposes under NRS 48.045(1)(a), after Ochs purposely solicited testimony regarding her good character. Under these circumstances, we conclude that there was no error in the district court's decision to allow the State to question Ochs's neighbor or present evidence of specific instances of conduct for the purpose of impeachment. [Footnote 5: Ochs also argues that evidence of these same bad acts was improperly admitted during rebuttal on the last day of trial because it was irrelevant in the context of the murder case. However, by soliciting rebuttal testimony as to the same subject matter, Ochs opened the door for the State to introduce evidence of these prior bad acts.]

(ECF No. 21-5 at 5-6 (footnote 4 omitted).) The Nevada Supreme Court's rejection of Ochs' claim was neither contrary to nor an unreasonable application of clearly established law as determined

by the United States Supreme Court and was not based on an unreasonable determination of the facts.[10]

Kristin McGrath, Ochs' next-door neighbor, testified that on August 2, 2006, she went outside to get her mail and saw Ochs and the three children, including B.B.C., in Ochs' vehicle, which was parked in Ochs' driveway. (ECF No. 35-39 at 112-113, 115.) McGrath spoke with Ochs and testified that she saw B.B.C. "laying in his car seat . . . smiling with his sunglasses up" on the top of his head. (*Id.* at 116.) During cross-examination, Ochs' trial counsel asked McGrath if "there [were] other things that [she] wanted to tell" law enforcement the day that they interviewed her. (ECF No. 35-40 at 11.) McGrath responded in the affirmative and stated that she wanted to tell them "[t]hat [Ochs] is a very kind person, and wouldn't hurt anybody." (*Id.* at 12.)

A bench conference was then held wherein the state stated that it "believe[d it could] establish as far as specific incidences that would rebut McGrath's opinion as far as [Ochs'] reputation" because Ochs' trial counsel asked "somewhat of a general question about what kind of mother she is or person she is." (ECF No. 35-40 at 15-16.) Ochs' trial counsel told the state to "ask away" and indicated that he did not want a limiting instruction to be given. (*Id.* at 16-17.) Following the bench conference, the following colloquy occurred between the state and McGrath on redirect examination:

> Q.  Were you aware of an incident involving [Ochs' daughter] where [Ochs] was at a party, and she slapped [her daughter] across the face?

---

[10] Ochs argues that this court should review this ground *de novo* because the Nevada Supreme Court never addressed her constitutional claims, or, alternatively, because the Nevada Supreme Court's decision was based on the unreasonable determination that Ochs opened the door for the state to introduce the evidence in question. (ECF No. 56 at 30, 38-39.) This court disagrees on both fronts: it presumes that the Nevada Supreme Court adjudicated this claim on the merits, and the fact that Ochs' trial counsel asked McGrath an open-ended question does not mean that the Nevada Supreme Court's determination that Ochs opened the door to the evidence was unreasonable. However, again, even reviewing this ground *de novo*, this court concludes that Ochs is not entitled to federal habeas relief.

| | | |
|---|---|---|
| 1 | A. | No. |
| | Q. | Were you aware of an incident with another foster child that she had in her |
| 2 | | care that she left in a linen closet? |
| | A. | What? |
| 3 | Q. | Were you aware of that? |
| | A. | No. |
| 4 | Q. | Were you aware of an incident involving another foster child that she left in |
| | | a car in a car set over night because she didn't want to hear him scream? |
| 5 | A. | No. |
| | Q. | Weren't aware of those incidences? |
| 6 | A. | No. Plus, I would have heard the baby crying. The driveway's right outside |
| | | my bedroom. |
| 7 | Q. | Were you also aware of an incident involving [B.B.C.] in California? |
| | A. | I heard about it afterwards. |
| 8 | Q. | And that he hit his head? |
| | A. | Yes, and they - - |
| 9 | Q. | Okay. |
| | A. | - - went to the emergency room. |
| 10 | Q. | And he went into the emergency room? And you also remember an incident |
| | | where [Ochs' daughter], who was I believe - - I think she was two or three |
| 11 | | at the time, was still being breast fed, and bit [Ochs], and the defendant |
| | | slapped her across the face? Were you aware of that incident? |
| 12 | A. | No. |

13  (*Id.* at 13-14.) On recross examination, Ochs' trial counsel asked if McGrath "wouldn't believe

14  [the allegations against Ochs] anyway, would [she]," and McGrath answered, "[n]o, never in a

15  million years." (*Id.* at 14.)

16  Later, the state requested that it be allowed to present rebuttal witnesses to say that Ochs

17  put "a child in the garage and left the child there all night," that she put a "child in the closet in the

18  hall," that she slapped her daughter on two occasions, and that her son had unsafely possessed a

19  hammer on at least one occasion. (ECF No. 36-9 at 3.) Except for the hammer incident, the state

20  district court allowed this evidence. (*Id.* at 4.) First, the state presented the testimony of Dana

21  Papania, a worker within the foster care system, who testified that during a home visit at Ochs'

22  residence, Ochs indicated that she placed one of her foster children "outside in the car" overnight

23  because his crying drove her crazy. (*Id.* at 5-6.) Ochs also told Papania that she placed a different

foster child in a basket "in this little closet right outside her bedroom" because the baby "sle[pt]

better there." (*Id.* at 7.) Second, the state presented the testimony of Schirling, who testified that

Ochs had told her that a "coffee table had fallen over on" B.B.C. approximately a month prior to

his death. (*Id.* at 12.) Schirling also testified that in the spring of 2006, at a CPS training, she saw

Ochs slap her daughter in the face after her daughter bit her while breastfeeding. (*Id.* at 13.) Finally,

the state presented the testimony of Audrey Rosenstein, another worker within the foster care

system, who testified that she observed Ochs slap her daughter at a birthday party and at the CPR

training. (*Id.* at 17-19.)

"A habeas petitioner bears a heavy burden in showing a due process violation based on an

evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*,

421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of

state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus

relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990). Therefore, the

issue before this Court is "whether the state proceedings satisfied due process." *Jammal v. Van de

Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a

basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation

of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*,

502 U.S. 62, 67 (1991)). Not only must there be "*no* permissible inference the jury may draw from

the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial."

*Jammal*, 926 F.2d at 920 (emphasis in original) (citation omitted).

Although the introduction of evidence of Ochs' actions towards other children portrayed

her in a negative light, it cannot be concluded that the admission of this evidence rendered her trial

fundamentally unfair in violation of due process. *Estelle*, 502 U.S. at 67; *Sublett*, 63 F.3d at 930;

*Jammal*, 926 F.2d at 920. As the Nevada Supreme Court reasonably noted, this evidence was admitted for the permissible purpose under Nevada law of impeaching McGrath's testimony that Ochs was a nice person who would not hurt anybody.[11] Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Yarborough*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). And importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id*. Accordingly, because the Nevada Supreme Court reasonably denied Ochs' claim, Ochs is denied federal habeas relief for ground 4.

### E.    Ground 5

In ground 5, Ochs alleges that the state district court used erroneous jury instructions. (ECF No. 18 at 32.) First, Ochs contends that the jury instructions permitted the jury to convict her of first-degree felony murder by means of child neglect, a non-existent crime. (*Id.* at 33.) Second, Ochs contends that the jury instructions concerning child abuse and murder misstated the law and were vague. (*Id.* at 35.) Third, Ochs contends that the statutory definitions of "child abuse" and "abuse and neglect" and their related jury instructions were unconstitutionally vague. (*Id.* at 38.) In its order affirming Ochs' judgment of conviction, the Nevada Supreme Court held:

---

[11] Nev. Rev. Stat. § 48.045(1)(a) provides that "[e]vidence of a person's character or a trait of his or her character is not admissible . . . except . . . [e]vidence of a person's character or a trait of his or her character offered by an accused, and similar evidence offered by the prosecution to rebut such evidence."

Ochs argues that the jury instructions omitted essential elements of the crime for which she was charged and that they were unconstitutionally vague. There is no evidence that Ochs objected to these instructions, and her argument is based on an isolated reading of the disputed instructions. Read together, the jury instructions contained all of the elements of the charged crimes. Furthermore, Ochs has failed to show prejudice. *See Rose v. State*, 86 Nev. 555, 558, 471 P.2d 262, 264 (1970). This argument has no merit.

(ECF No. 21-5 at 7.) The Nevada Supreme Court's rejection of Ochs' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.[12]

Jury Instruction No. 3 outlined the three theories for Ochs' open murder charge: (1) the killing of B.B.C. was "willful, deliberate, and premeditated"; (2) "the killing [of B.B.C.] occur[ed] during the perpetration or attempted perpetration of child abuse"; and/or (3) the killing occurred because Ochs "did permit or allow [B.B.C.] to suffer unjustifiable physical pain or mental suffering as a result of neglect." (ECF No. 36-10 at 4.)[13] The jury was then instructed that Ochs' "open charge of murder" included first-degree murder, second-degree murder, and involuntary manslaughter and that it "must decide if [Ochs] is guilty of any offense."[14] (*Id.* at 5.)

Regarding the second theory of Ochs' open murder charge, first-degree felony-murder by means of child abuse, Nev. Rev. Stat. § 200.030(1)(b) provides that "[m]urder of the first degree is murder which is . . . [c]ommitted in the perpetration or attempted perpetration of . . . child abuse."

---

[12] Ochs argues that this court should review this ground *de novo* because the Nevada Supreme Court did not address her constitutional argument and failed to articulate the proper test for evaluating the claim. (ECF No. 56 at 44-45.) This court disagrees for the reasons it has discussed previously in this order, but again, even reviewing this ground *de novo*, this court concludes that Ochs is not entitled to federal habeas relief.

[13] As Ochs accurately notes, the third theory was not added until after the jury's verdict was reached, as the original information only contained the first two theories. (*Compare* ECF No. 34-2 *with* ECF No. 36-14.)

[14] The verdict form had the following selections: guilty of first-degree murder, guilty of second-degree murder, guilty of involuntary manslaughter, and not guilty. (ECF No. 36-12.)

As used in Nev. Rev. Stat. § 200.030(1)(b), "'[c]hild abuse' means physical injury of a nonaccidental nature to a child under the age of 18 years." Nev. Rev. Stat. § 200.030(6)(b). Ochs argues that Jury Instruction No. 10 should have used this definition of child abuse—the one provided in Nev. Rev. Stat. § 200.030(6)(b)—instead of using the definition of child abuse from Nev. Rev. Stat. § 200.508, which defines and identifies the penalties for the crimes of abuse, neglect, or endangerment of a child. (ECF No. 56 at 49.)

Jury Instruction No. 10 provided that:

"Child abuse" is defined as a person who willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to place a child in a situation where the child may suffer physical pain or mental suffering as a result. Abuse or neglect means physical or mental injury of a nonaccidental nature of a child under the age of 18 years of age.

(ECF No. 36-10 at 11.) Ochs is correct that Jury Instruction No. 10 used the definition of child abuse from the abuse or neglect statutes, Nev. Rev. Stat. § 200.508, rather than from the homicide statutes, Nev. Rev. Stat. § 200.030. *See* Nev. Rev. Stat. § 200.508(1) ("A person who willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to be placed in a situation where the child may suffer physical pain or suffering as the result of abuse or neglect"); *see also* Nev. Rev. Stat. § 200.508(4)(a) ("'Abuse or neglect' means physical or mental injury of a nonaccidental nature, sexual abuse, sexual exploitation, negligent treatment or maltreatment of a child under the age of 18 years."). As it pertains to first-degree felony-murder by means of child abuse, this alleged error appears to be problematic because the definition of child abuse from Nev. Rev. Stat. § 200.508 is broader than the definition of child abuse from Nev. Rev. Stat. § 200.030. Importantly, child neglect is only discussed in the definition from Nev. Rev. Stat. § 200.508, not the definition from Nev. Rev. Stat. § 200.030.

Ochs contends that the inclusion of the child abuse definition from Nev. Rev. Stat. § 200.508 allowed the jury to incorrectly conclude that it could find her guilty of first-degree murder by means of child abuse if it determined that B.B.C. died as a result of her neglect. (ECF No. 56 at 49.) Ochs is correct that Nevada law does not provide that first-degree murder can be based on child neglect. In fact, the Nevada Supreme Court has held that it was "not willing to read NRS 200.030(1)(a) so as to define first degree murder to include a murder which is perpetrated by means of child neglect." *Labastida v. State*, 115 Nev. 298, 302, 986 P.2d 443, 446 (1999) (explaining that "[t]he use of the term 'child abuse' and not 'child neglect' in NRS 200.030(1)(a) evinces the legislature's intent that different meanings apply to the two terms and that a murder perpetrated by means of 'child abuse,' and not 'child neglect,' constitute first degree murder"). As such, this court agrees that using the child abuse definition from Nev. Rev. Stat. § 200.508, which included references to child neglect, instead of the child abuse definition from Nev. Rev. Stat. § 200. 030 in Jury Instruction No. 10 was erroneous, especially since it preceded Jury Instruction No. 11, which defined first-degree felony-murder by means of child abuse.[15]

However, issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying

---

[15] Jury Instruction No. 11 provided:

> There are certain kinds of murder which carry with them conclusive evidence of malice aforethought. One of these classes of murder is murder committed in the perpetration or attempted perpetration of Child Abuse. Therefore, a killing which is committed in the perpetration of Child Abuse is deemed to be Murder of the First Degree, whether the killing was intentional or unintentional. This is called the Felony-Murder rule. The specific intent to perpetrate or attempt to perpetrate Child Abuse must be proven beyond a reasonable doubt.

(ECF No. 36-10 at 12.)

state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)). And significantly, when reviewing a jury instruction, this court considers that jury instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72; *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation.").

Although the location of Jury Instruction No. 10 may not have been ideal and there was no additional jury instruction defining child abuse in accordance with Nev. Rev. Stat. § 200.030, the court cannot conclude that the issues surrounding Jury Instruction No. 10 "so infected the entire trial that the resulting conviction violates due process." *Henderson*, 431 U.S. at 154. Indeed, Jury Instruction No. 10 appears to be in reference to the third theory of Ochs' open murder charge, second-degree felony-murder by means of child neglect. And Jury Instruction No. 14 makes it clear that this theory—neglect of a child that results in death—is second-degree murder, not first-degree. (ECF No. 36-10 at 15.) This is consistent with Nevada law. *See Sheriff v. Morris*, 99 Nev. 109, 113, 117-18, 659 P.2d 852, 856, 858-59 (1983) (concluding that Nevada's involuntary manslaughter statute, when read in combination with Nevada's murder statute, permits the offense of second-degree felony murder); *see also Ramirez v. State*, 126 Nev. 203, 208-09, 235 P.3d 619, 623 (2010) (explaining that Nevada's felony offense of child neglect under Nev. Rev. Stat. § 200.508 can act as the predicate felony to support a second-degree felony-murder conviction). Accordingly, as the Nevada Supreme Court reasonably noted, after considering the jury

instructions as a whole, Ochs fails to demonstrate that Jury Instruction No. 10 allowed the state to evade its responsibility of proving every element of first-degree felony murder by means of child abuse. Instead, the jury instructions appropriately informed the jury that a death in connection with child abuse applied to first-degree murder while a death in connection with child neglect applied to second-degree murder.

Next, Ochs argues that Jury Instruction No. 10 was vague because it is unclear what the reference to "as a result" at the end of the first sentence is in reference to. (ECF No. 56 at 52.) It is true that, after reviewing Nev. Rev. Stat. § 200.508(1), Jury Instruction No. 10 left out "of abuse or neglect" at the end of the first sentence. *Compare* Nev. Rev. Stat. § 200.508(1) ("A person who willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to be placed in a situation where the child may suffer physical pain or suffering as the result *of abuse or neglect*." (Emphasis added)), *with* ECF No. 36-10 at 11 (Jury Instruction No. 10's language that "'[c]hild abuse' is defined as a person who willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to place a child in a situation where the child may suffer physical pain or mental suffering as a result"). However, reading the sentence in context, it is clear that "as a result" is in reference to "abuse or neglect" because "abuse or neglect" follows "as a result" earlier in the sentence.

Turning to Ochs' next contention, she claims that Jury Instruction No. 11, which provided, in part, that "a killing which is committed in the perpetration of [c]hild [a]buse is deemed to be [m]urder of the [f]irst [d]egree, whether the killing was intentional or unintentional" (ECF No. 36-10 at 12), and Jury Instruction No. 9 allowed the jury to convict her of felony murder by way of child abuse if the jury found that B.B.C.'s injuries were accidental. (ECF No. 56 at 52-53.) Ochs

fails to demonstrate how Jury Instruction No. 9 allowed the jury to convict her of murder if B.B.C.'s injuries were accidental, and Jury Instruction No. 11 specifically provided that "[t]he specific intent to perpetrate or attempt to perpetrate [c]hild [a]buse must be proven beyond a reasonable doubt." (ECF No. 36-10 at 12.) Furthermore, the jury was also instructed that "[a]buse or neglect means physical or mental injury of a nonaccidental nature of a child under the age of 18 years of age." (ECF No. 36-10 at 11.)

Finally, Ochs argues that the statutory definitions of "child abuse" and "abuse and neglect" and their related jury instructions were unconstitutionally vague because they do not inform the public that a person can be found guilty of first-degree felony murder by means of child neglect. (ECF No. 56 at 53.) However, the jury instructions do not demonstrate—when read as a whole—that a person can be found guilty of first-degree felony murder by way of child neglect. Instead, as this court concluded earlier, Jury Instruction No. 14 makes it clear that the third theory of Ochs' open murder charge—neglect of a child that results in death—is second-degree felony murder.

Because the Nevada Supreme Court reasonably denied this claim, Ochs is denied federal habeas relief for ground 5.

### F.   Ground 6

In ground 6, Ochs alleges four claims of ineffectiveness of her trial counsel. (ECF No. 18 at 42-48.) In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A court considering a claim of

ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.[16]

---

[16] Ochs argues that the Nevada Supreme Court did not apply the correct test for deciding ineffective assistance of trial counsel claims, instead deferring to the state district court's findings, not just its factual ones. (ECF No. 56 at 57-66.) If the Nevada Supreme Court used the wrong standard, this court "need not defer to that decision" and, instead, may analyze the claim *de novo*. *Hardy v. Chappell*, 849 F.3d 803, 820 (9th Cir. 2016). However, even if this court reviews the four subparts of ground 6 *de novo*, it would conclude that Ochs is not entitled to federal habeas relief.

### 1.      Ground 6.1

In ground 6.1, Ochs alleges that her trial counsel failed to object at several points during her trial. (ECF No. 18 at 42.) Specifically, Ochs alleges that her trial counsel failed to object to the state's expert witnesses offering testimony on her guilt or innocence, to the victim being referred to as B.B.C. rather than the name given to him by Ochs and her husband, to the introduction of various bad act testimony without an on-the-record hearing, to references to the condition of her residence, and to the jury instructions. (*Id.* at 42-43.) Ochs contends that these failures prevented her from having the issues heard by the state district court at the time of the error and from the Nevada Supreme Court considering them on appeal. (ECF No. 56 at 67.) In affirming the denial of Ochs' state habeas petition, the Nevada Supreme Court held:

> Ochs argues that trial counsel was ineffective for failing to make timely and contemporaneous objections to errors at trial which precluded this court's review on appeal. The district court found that Ochs failed to specify exactly which objections counsel should have made, to show that any objections would have resulted in a more favorable outcome, and to demonstrate prejudice, as this court reviewed all but one of the unpreserved claims on appeal. . . . Having reviewed the record on appeal, we conclude that substantial evidence supports the district court's findings and its decision to deny relief and that the district court did not err as a matter of law. *Riley v. State*, 110 Nev. 638, 647, 878 P.2d 272, 278 (1994).

(ECF No. 21-11 at 2-4.) The Nevada Supreme Court's rejection of Ochs' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

The Nevada Supreme Court only refused to review one of Ochs' claims on appeal because her trial counsel failed to object: the claim that the state's expert witnesses offered testimony on her guilt or innocence. (*See* ECF No. 21-5 at 5 n.3.) However, as was discussed in ground 3, this claim lacks merit, as the state's witnesses did not directly opine on Ochs' guilt. As such, Ochs fails to demonstrate that the result of her trial or appeal would have been different had her trial counsel

objected. *Strickland*, 466 U.S. at 694; *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (explaining that a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal").

Turning to the introduction of various bad act testimony and the jury instructions, the Nevada Supreme Court noted on appeal that Ochs' trial counsel failed to object at her trial, but it reviewed these issues nonetheless for plain error, finding no error. (*See* ECF No. 21-5 at 5-7.) Because there were no errors identified by the Nevada Supreme Court on these issues, the Nevada Supreme Court was not going to grant relief to Ochs regardless of whether her trial counsel had objected or not. *See* Nev. Rev. Stat. §§ 178.598, 178.602; *see also United States v. Olano*, 507 U.S. 725, 734 (1993); *Green v. State*, 119 Nev. 542, 545 n.7, 80 P.3d 93, 95 n.7 (2003). And there is no evidence in the record demonstrating that the state district court would have sustained objections to the bad act testimony, especially since Ochs' trial counsel opened the door to this evidence, or the jury instructions[17] if Ochs' trial counsel had made them. Again, as such, Ochs fails to demonstrate that the result of her trial or her appeal would have been different had her trial counsel objected. *Strickland*, 466 U.S. at 694; *Smith*, 528 U.S. at 285.

Turning finally to the alleged improper references to the victim as B.B.C. and the condition of Ochs' residence, there is no evidence in the record that, had Ochs' trial counsel objected, the state district court would have made the state use B.B.C.'s given name, especially when B.B.C. was his legal name, or would have disallowed the introduction of the pictures of Ochs' residence during the investigators' testimonies. Thus, it cannot be concluded there is a reasonable probability

---

[17] *See* ECF No. 36-9 at 26-28 (discussions of the jury instructions wherein the state district court noted, in part, to an objection, "you're going to be free to argue that").

that, had Ochs' trial counsel objected to these issues, the result of her trial would have been different. *Strickland*, 466 U.S. at 694. Further, Ochs was able to address these points during her examination. Ochs testified that she did not call the victim B.B.C. (ECF No. 36-4 at 35.) B.B.C. was simply the victim's legal name that Ochs was required to use in "legal situations." (*Id.* at 36.) Normally, Ochs referred to B.B.C. by the name she had given him. (*Id.*) Ochs also testified that her residence was in bad shape on the day B.B.C. sustained his injuries because she had "been gone for a month down in San Diego," and upon returning, her children had gotten "out every toy in the house." (*Id.* at 24.) Ochs further explained:

> I also prefer to spend more time with my kids than cleaning my house, so I didn't jump right in and clean it all up immediately. I had the suitcases out and I'm not adverse to living out of suitcases for a while, so we had suitcases on the couch.
> And friends of mine would know that I did foster care and give me donations of clothing and toys and beds and car seats and we get a lot of great stuff. And I was constantly in the process of sorting it out, but I had gotten behind on it. And so I was trying to sort through the clothing to give donations, put things aside because as each of my babies would leave to go to another foster home or back to a parent, I'd send a bag of clothing and some little toys and just some things because I never knew what people had and it's hard when you get a baby like that to have all of the things you needed. So I tried to keep things on hand to also pass on with each child. And so I was in the process of sorting, trying to pare down. I think you might have seen the big Rubbermaid tubs in some of the pictures. I kept one in each room and would sort through one whichever room I was sitting in the kids with. So my sorting project was kind of spread throughout the house, (inaudible) laundry. And my house in never spotless anyways, so.

(*Id.* at 24-25.) Ochs also explained why there were ants in her kitchen. (*Id.* at 27.)

Because the Nevada Supreme Court reasonably denied Ochs relief on this claim, Ochs is denied federal habeas relief for ground 6.1.

2.       **Ground 6.2**

In ground 6.2, Ochs alleges that her trial counsel failed to comply with discovery rules, which resulted in the limitations placed on Dr. Shuman's testimony, as was further discussed in ground 2. (ECF No. 18 at 43.)

The Nevada Supreme Court did not address this ground in affirming the denial of Ochs' state habeas petition. (*See* ECF No. 21-11.) Because the Nevada Supreme Court's opinion "does not come accompanied with [the] reasons" why it implicitly denied this ground, this court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018). This court "then presume[s] that the unexplained decision adopted the same reasoning." *Id.* Here, the state district court held:

> Defendant also claims that counsel's handling of expert witness, Dr. Shuman, was a conflict of interest because counsel's handling of Dr. Shuman resulted in the court limiting Dr. Shuman's testimony to Defendant's detriment. This claim fails to allege a conflict of interest as it is up to counsel to decide what witnesses to call, and trial counsel's handling of Dr. Shuman in this case fell within counsel's discretion. Furthermore, Defendant fails to establish any prejudice with respect to counsel's handling of Dr. Shuman. While Dr. Shuman did not turn over his reports until trial, and therefore the State objected to his testimony altogether, the court still allowed Dr. Shuman to testify the following day after the State reviewed his articles. Thus, this claim is without merit.

(ECF No. 37-12 at 4-5.) The state district court's rejection of Ochs' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

Following the state's request for Dr. Shuman's testimony to be excluded, Dr. Shuman explained that he had five or six articles on his computer that he believed would come up during his testimony. (ECF No. 36-2 at 36.) Dr. Shuman then explained that he "ha[d] discussed with the defense attorney some of the articles [he would] like to present," but he did not "know what [the

state was] going to ask." (*Id.*) Therefore, Dr. Shuman brought his computer with the articles handy "to refresh his recollection" if needed. (*Id.*) Ochs' trial counsel then explained, "I didn't know he was going to do the article thing until this morning, so. We've been scrambling as well." (*Id.* at 39.)

It appears that Ochs' trial counsel was unaware that Dr. Shuman was going to bring his computer with copies of articles on it to trial. However, even if Ochs' trial counsel was deficient for not providing the articles to the state when it was likely that Dr. Shuman would be discussing them, the state district court reasonably concluded that Ochs failed to demonstrate prejudice. *Strickland*, 466 U.S. at 694. As was discussed in ground 2, Dr. Shuman was able to testify that B.B.C.'s "entire injury can be explained by one impact" and that his injuries were consistent with a short fall from a washing machine. (ECF No. 36-3 at 30, 61-62.) Additional support for these conclusions from the articles would have been beneficial to Ochs' defense. However, it cannot be concluded that there is a reasonable probability of a different outcome at trial had Ochs' trial counsel provided the articles, thereby allowing Dr. Shuman to discuss them, because Dr. Shuman's ultimate conclusions regarding B.B.C.'s injuries were presented to the jury. *Strickland*, 466 U.S. at 694. Because the state district court reasonably denied Ochs' claim, Ochs is denied federal habeas relief for ground 6.2.

### 3.     Ground 6.3

In ground 6.3, Ochs alleges that her trial counsel opened the door to the admission of bad act testimony. (ECF No. 56.) In affirming the denial of Ochs' state habeas petition, the Nevada Supreme Court held:

> Ochs argues that trial counsel was ineffective for putting her character into evidence, thereby opening the door for the State to introduce other bad acts . . . . The district court found that trial counsel's decision regarding character evidence was a strategic one the district court would not second-guess, *see Donovan v. State*,

94 Nev. 671, 675, 584 P.2d 708, 711 (1978) . . . . Having reviewed the record on appeal, we conclude that substantial evidence supports the district court's findings and its decision to deny relief and that the district court did not err as a matter of law. *Riley v. State*, 110 Nev. 638, 647, 878 P.2d 272, 278 (1994).

(ECF No. 21-11 at 3-4.) The Nevada Supreme Court's rejection of Ochs' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court and was not based on an unreasonable determination of the facts.

As was discussed in ground 4, Ochs' trial counsel asked one of the state's witnesses, McGrath, if there was anything else she wanted to inform law enforcement during her interview. (ECF No. 35-40 at 11.) McGrath responded that she wanted to tell them "[t]hat [Ochs] is a very kind person, and wouldn't hurt anybody." (*Id.* at 12.) A bench conference was held, and the state requested, based on Ochs' trial counsel's foregoing question to McGrath, that it be able to "rebut McGrath's opinion" with specific instances of Ochs' reputation. (*Id.* at 15-16.) Ochs' trial counsel responded, "ask away." (*Id.* at 16-17.) The state then asked McGrath about various incidents concerning Ochs' actions towards B.B.C. and other children: slapping her daughter, putting a baby in the closet, leaving a baby in a vehicle in the garage, and allowing B.B.C. to get a head injury. (*Id.* at 13-14.) On recross examination, Ochs' trial counsel asked if McGrath "wouldn't believe [the allegations against Ochs] anyway, would [she]," and McGrath answered, "[n]o, never in a million years." (*Id.* at 14.)

As the Nevada Supreme Court reasonably determined, Ochs fails to demonstrate that her trial counsel acted deficiently. *Strickland*, 466 U.S. at 688. It is apparent from Ochs' trial counsel's statement that the state "ask away" regarding specific instances of Ochs' reputation that he was not concerned with the answers that McGrath would give. And indeed, McGrath's response during cross-examination that she would not believe the allegations against Ochs was beneficial to Ochs'

defense and defused the questions asked by the state during redirect examination. Moreover, Ochs'

trial counsel asked Ochs about these specific instances during Ochs' trial testimony, and as such,

Ochs was able to explain her side of the incidents in question.[18] Accordingly, because the Nevada

Supreme Court reasonably denied this claim, Ochs is denied federal habeas relief for Ground 6.3.

### 4.    Ground 6.4

In ground 6.4, Ochs alleges that her trial counsel's failures, considered cumulatively,

prejudiced her. (ECF No. 18 at 48.) In affirming the denial of Ochs' state habeas petition, the

Nevada Supreme Court held:

> Ochs argues that the cumulative errors and combined deficiencies by trial counsel
> mandate relief. The district court found that this claim was without merit as none
> of Ochs's claims entitled her to relief. Having reviewed the record on appeal, we
> conclude that substantial evidence supports the district court's findings and its
> decision to deny relief and that the district court did not err as a matter of law. *Riley
> v. State*, 110 Nev. 638, 647, 878 P.2d 272, 278 (1994).

(ECF No. 21-11 at 4.) The Nevada Supreme Court's rejection of Ochs' claim was neither contrary

to nor an unreasonable application of clearly established law as determined by the United States

Supreme Court and was not based on an unreasonable determination of the facts.

Cumulative error applies where, "although no single trial error examined in isolation is

sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also*

*Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess

---

[18] For example, Ochs testified that one of her other children tipped a coffee table over, hitting
B.B.C. in the face, and that she took him to the emergency room as a precaution; that she let one
of her foster babies keep sleeping in the car after they arrived home since she periodically checked
on him, propped the door open to the house, and left the windows down in order to hear him from
inside; and that she put a bassinet in her large, walk-in closet for one of her foster babies because
she was sensitive to light and sound and slept better there. (ECF No. 36-4 at 12, 18-19; ECF No.
36-5 at 1-3.)

whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). This Court has not identified any definite errors on the part of Ochs' trial counsel, so there are no errors to cumulate. Ochs is denied federal habeas relief for Ground 6.[19]

## IV.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Ochs. Rule 11 of the Rules Governing Section 2254 Cases requires this court issue or deny a certificate of appealability (COA). As such, this court has *sua sponte* evaluated the remaining claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

Applying these standards, this court finds that a certificate of appealability is warranted for ground 5. Reasonable jurists could debate whether the omission of a jury instruction defining child

---

[19] Ochs requests that this court "[c]onduct an evidentiary hearing at which proof may be offered concerning the allegations in [her] amended petition and any defenses that may be raised by respondents." (ECF No. 18 at 49.) Ochs fails to explain what evidence would be presented at an evidentiary hearing. Moreover, this court has already determined that Ochs is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this court's reasons for denying relief. Thus, Ochs' request for an evidentiary hearing is denied.

abuse in accordance with Nev. Rev. Stat. § 200.030 and the placement of Jury Instruction No. 10, which defined child abuse or neglect for the purposes of second-degree felony murder, before the jury instruction on first-degree felony murder "so infected the entire trial that the resulting conviction violate[d] due process." *Henderson*, 431 U.S. at 154. Reasonable jurists could then debate whether this error had a "substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman,* 525 U.S. 141, 145 (1998). Ochs' defense was that she placed B.B.C. on top of the washing machine, where she normally changed him, and stepped away to see to her other two children. And Ochs' experts testified that B.B.C.'s injuries could have resulted from a fall from a washing machine. (*See* ECF No. 36-3 at 30, 61-62 (Dr. Shuman's testimony), ECF No. 36-6 at 8 (Dr. Kenneth Monson's testimony).) Given these facts, the placement of Jury Instruction No. 10, which included neglect within the definition of child abuse, immediately before Jury Instruction No. 11, which provided that first-degree felony murder is "a killing which is committed in the perpetration of [c]hild [a]buse," could have resulted in the jury mistakenly convicting Ochs of first-degree murder on a theory of neglect.

This court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Ochs' remaining grounds.[20]

---

[20] Following the filing of Ochs' amended petition, this court issued a scheduling order, instructing the respondents to "raise all potential affirmative defenses in [their] initial responsive pleading" and explaining that "[s]uccessive motions to dismiss [would] not be entertained." (ECF No. 19 at 2.) Thereafter, the respondents filed a motion to dismiss on grounds of procedural default and failing to state cognizable claims. (*See* ECF No. 20.) This court denied the motion to dismiss, ordering the respondents to "file and serve an answer." (ECF No. 26.) Nine months later, after several extensions of time, the respondents filed a motion for leave to file a second motion to dismiss, rather than an answer. (ECF No. 38.) This court denied the motion "because the court informed respondents that it would entertain only one motion to dismiss." (ECF No. 47 at 1.) However, this court allowed the respondents to "raise a limitation defense in their answer" because the court found no express "indication in the scheduling order or otherwise that respondents ha[d] waived that defense." (*Id.*) This court noted that it "has since clarified this point in scheduling orders in later-filed cases." (*Id.* at 3.)

**V.      CONCLUSION**

In accordance with the foregoing, **IT IS THEREFORE ORDERED**:

    1.        The petition (ECF No. 18) is DENIED.

    2.        A certificate of appealability is GRANTED for ground 5 and DENIED as to Ochs' remaining grounds.

    3.        The clerk of the court will substitute Jerry Howell for Respondent Dwight Neven.

    4.        The clerk of the court is directed to enter judgment accordingly.

Dated:  September 21, 2021.

JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE

---

In their answering brief, the respondents now argue that Ochs' claims are barred by the statute of limitations and that ground 3 does not relate back to the original petition. (ECF No. 51 at 11-14.) Ochs objects, arguing that she has been severely prejudiced by the decision to allow the respondents a second opportunity to launch a defense that they opted not to raise it in their initial motion to dismiss. (ECF No. 56 at 73-74.) Alternatively, Ochs acknowledges that her petition was filed late, but she argues that she is entitled to equitable tolling because she had to learn from the law library, rather than from her post-conviction counsel, that the Nevada Supreme Court had denied her post-conviction appeal, and once she learned of the denial, she acted swiftly in filing her federal petition. (ECF No. 56 at 73-78.) Based on (1) Ochs' prejudice argument, (2) the foregoing issues regarding the respondents' raising of defenses in this case, and (3) the parties' arguments and the evidence that has been submitted regarding whether the statute of limitations should be equitably tolled and whether ground 3 relates back to Ochs' original petition, this court determines that habeas review should not be precluded. *Holland v. Florida*, 560 U.S. 631, 649 (2010); *Ross v. Williams*, 950 F.3d 1160 (9th Cir. 2020).